UNITED STATES of America,

v.

Isaac JEROME–OBOH, Defendant.

No. 94–CR–84A.

United States District Court,
W.D. New York.

Feb. 7, 1995.

Patrick H. NeMoyer, U.S. Atty. (James P. Kennedy, Jr., Asst. U.S. Atty., of counsel), Buffalo, NY, for the Government.

Jonathan W. Feldman, Federal Public Defender (Kimberly A. Schechter, Asst. Public Defender, of counsel), Buffalo, NY, for defendant.

## DECISION AND ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio on July 11, 1994, pursuant to 28 U.S.C. § 636(b)(1). On October 21, 1994, Magistrate Judge Foschio filed a Report and Recommendation recommending denying defendant's motions to suppress evidence and to dismiss Count II of the Indictment.

On November 7, 1994, defendant filed objections to Magistrate Judge Foschio's Report and Recommendation. The government filed a response to defendant's objections on November 18, 1994, and defendant filed a reply on November 29, 1994. The Court heard argument on January 11, 1995. On January 31, 1995, defendant provided the Court with a supplemental submission.[1]

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation and of the record, and after reviewing all the submissions and hearing argument, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, defendant's motions to suppress evidence and to dismiss Count II of the Indictment are denied.

1. This submission was not filed until February 6, 1995.

The parties shall appear in Part II of the Court at 9:00 a.m. on February 14, 1995 for a meeting to set trial date.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This case was referred to the undersigned by the Hon. Richard J. Arcara on July 11, 1994 for disposition of all pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A), and for report and recommendation pursuant to § 636(b)(1)(B). It is presently before the court on Oboh's motion to dismiss Count II of the Indictment and for suppression of physical evidence and statements.

### *BACKGROUND*

Oboh was charged, in a three-count Indictment dated June 1, 1994, with violations of Title 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 952(a), 960(a) and 960(b)(2), and Title 18 U.S.C. § 545. Specifically, he was charged, in Count I, with unlawfully importing into the United States 100 grams or more of a substance containing heroin. Additionally, he was charged, in Count II, with unlawfully bringing into the United States certain merchandise, namely a quantity of heroin, contrary to law. Finally, he was accused of the unlawful possession with intent to distribute 100 grams or more of a substance containing heroin (Count III).

On July 7, 1994, Oboh filed a motion and memorandum of law in support, seeking dismissal of Count II of the Indictment on the grounds that it is unconstitutionally applied, is multiplicitous and violates Department of Justice policy, and suppression of evidence seized and statements made at the border stop and search of Oboh on the ground that there was an insufficient basis on which to compel Oboh to submit to a strip search.

On July 21, 1994, the Government filed a response in opposition to Oboh's motions. A evidentiary hearing was conducted by this

court on August 4, 1994, at which the Government offered the testimony of Immigration Inspector Jeffrey M. Roulhac, Customs Inspectors Robert Wyzykiewicz and Michael H. Bartel, and Customs Special Agent Vincent J. Salvatore. The following exhibits were offered into evidence: documents seized from Oboh, a photograph of money found in Oboh's briefcase, tickets found within the briefcase, Defendant's customs declaration and a photograph of seized contraband.

On September 9, 1994, Oboh filed a reply memorandum in response to the Government's opposition to his motions. The Government filed its reply on September 21, 1994, and Oboh filed a final reply on September 29, 1994.

For the reasons that follow, the Defendants' motions to dismiss Count II of the Indictment and to suppress evidence and statements should be DENIED.

### FACTS

Immigration Inspector Jeffrey M. Rouhlac testified that on April 21, 1994, he observed the arrival of an Amtrak train from Canada at the Whirlpool Bridge in Niagara Falls, New York at approximately 11:45 a.m. (T.115).[1] He boarded the train to conduct the primary inspection of individuals entering the country, including Oboh. (T.116). Oboh was seated on the train when Rouhlac approached him, and was surrounded by papers, as if he were trying to appear busy. (T.147). Rouhlac asked him his citizenship and picked up his customs declaration form. (T.119). Oboh gave Rouhlac his passport, which indicated that he was Nigerian. (T.121). The passport also showed that Oboh had travelled extensively. (T.122). Rouhlac asked Oboh the purpose of his visit, and Oboh said that he wanted to see Buffalo. (T.123). Oboh also said that he was the manager of the housekeeping department of a hospital. (T.123). Rouhlac picked up a document that was on Oboh's tray table, and noticed it was dated 1992. (T.124).

Rouhlac decided that a secondary inspection was appropriate, based on Oboh's hesi-

tancy and answers to his questions, the passport showing extensive travel and citizenship from a source country for contraband. He also found it strange that Oboh would travel from Toronto to Buffalo for only a few hours. (T.122, 124–127). Rouhlac then gave Oboh's passport to Inspector Bartel, and told the customs inspectors to inquire further. (T.128). The primary encounter lasted from two to five minutes. (T.128).

On cross-examination, Rouhlac stated that he decided he was going to refer Oboh for a secondary inspection when he learned of the Defendant's Nigerian citizenship. (T.142). He further stated that he refers all Nigerians to secondary inspections. (T.144).

United States Customs Inspector Robert Wyzykiewicz testified that on April 21, 1994, he was on duty at the Whirlpool Bridge in Niagara Falls on the border between the United States and Canada. Between approximately 11:30 and 11:45 a.m., a train arrived from Canada, and the customs and immigration inspectors entered the train to question the incoming travelers and collect declaration forms. (T.11–12). During the course of their duties, Immigration Inspector Jeffrey Rouhlac indicated to Wyzykiewicz that he wished for the inspectors to conduct a secondary inspection of Oboh. (T.14). Inspector Bartel asked Oboh some questions regarding his nationality, and determined that the inspectors should move him to the dining car to conduct the secondary inspection. (T.15). Oboh had both tray tables down and there were numerous business papers strewn about, some of which were dated years before. (T.75–76, 82). When the inspectors asked Oboh to accompany them to the dining car, he let out a sigh of exasperation. (T.17).

Inspector Wyzykiewicz testified that Oboh brought all his luggage and paperwork to the dining car. (T.19). Inspector Wyzykiewicz stated that the inspectors typically conduct a secondary inspection in the dining car because it is private and less obtrusive for the individual being questioned, and it is easier

---

1. "T." references are to the transcript of the evidentiary hearing conducted on August 4, 1994.

to inspect the person's luggage. (T.19–20). Inspector Wyzykiewicz testified that, in the dining car, Inspector Bartel continued to question Oboh regarding his citizenship and itinerary, and Inspector Wyzykiewicz went through the Defendant's bag and briefcase. (T.21–22). He found $2100 in United States currency in an envelope in Oboh's briefcase, along with traveler's checks and foreign currency. (T.24–25). He also discovered airline tickets showing travel from Brussels, to Frankfurt to Toronto the previous day. (T.26–27, 29). Inspector Wyzykiewicz stated that Brussels is frequently used as a transfer point for drug couriers. (T.28, 30).

Oboh presented a Nigerian passport which indicated extensive travel. (T.30, 33). He also gave contradictory responses to the inspectors, stating that he had travelled to Canada on business, and was on vacation. (T.35). Oboh told the inspectors that he was in the medical supply business, and Inspector Wyzykiewicz asked him some questions regarding computerized IV's to test if Oboh was truly in the medical field. (T.37). Oboh had not heard of computerized IV's, and stated that he was buying medicines from hospitals in Canada to ship overseas. (T.68). Inspector Wyzykiewicz also found some paperwork regarding remodeling and building supplies in the briefcase. (T.38). The inspectors had conducted a pocket search, but when Oboh was unable to adequately respond to the inspectors' questions, they decided to conduct a complete patdown search. (T.39–41). Although Wyzykiewicz could not say that he suspected Oboh of committing a crime, he knew, at that point, that "something was not right." (T.84).

Inspector Bartel conducted the patdown search, and when he reached the Defendant's groin area, he stated that he felt something hard. (T.43). Oboh repeatedly said that it was his penis. (T.44). The inspectors then decided, and their supervisor agreed, that a strip search was necessary, because they felt that "there was something in there." (T.44–45).

The inspectors took Oboh into the handicap bathroom within the dining car. (T.46). The Defendant resisted and became boisterous, yelling, "what's wrong with you people, do you want to see my penis?" (T.46). After the inspectors walked Oboh into the bathroom, they asked him to remove his shirt and shoes, and he complied. (T.48). The Defendant, however, refused to remove his pants. Several times, he loosened them, and pulled them down partway, but then pulled them up again. (T.48). When Oboh again yelled "do you want to see my penis," Inspector Bartel answered that he did. (T.49). The inspectors then told Oboh that if he did not remove his pants, they would do it for him. Oboh took off his pants and lunged toward the toilet. (T.50). Inspector Bartel grabbed the pants and pair of underwear, and the inspectors noticed that the Defendant was wearing a second pair of underwear. (T.50). Oboh then said "don't go planting anything on me." (T.67).

In the underwear, Inspector Bartel found a tied-up blue handkerchief, and took it out of the bathroom. (T.53–54). Inside the handkerchief, the inspectors found several condoms filled with a substance and smelling of excrement. (T.55). Oboh was then transferred to the Customs office. (T.63). A field test on the substance in the condoms was positive for heroin. (T.65).

Inspector Wyzykiewicz testified that the inspectors did not raise their voices, except when Inspector Bartel told Oboh that he wanted to see his penis, and they did not have physical contact with Oboh, except for the patdown search, until he lunged toward the toilet after removing his pants. (T.66, 176–177). The inspectors never unholstered their weapons, and Oboh appeared to understand their questions, responding appropriately, albeit inconsistently. (T.66, 80, 178). The total time of the secondary inspection did not exceed twenty minutes. (T.66).

Customs Inspector Michael H. Bartel testified that he was assigned to the Amtrak train at the Whirlpool Bridge on April 21, 1994. (T.150). During the course of their inspection of travellers on the train, Inspector Rouhlac told Inspector Bartel about Oboh and indicated that customs inspectors would be interested in speaking to him. (T.152). When Inspector Bartel approached the Defendant, he appeared to be busy working on papers on the tray tables in front of him.

(T.153). Inspector Bartel then asked Defendant his citizenship, and he replied that he was Nigerian. (T.153). In response to Inspector Bartel's questions, Oboh said that he was on vacation, and was coming into the United States, for just one day, because he had never been here before. (T.154–155). Oboh's responses "didn't seem right," so Inspector Bartel asked Oboh to follow him to the dining car. (T.155).

In the dining car, Inspector Bartel continued to question Oboh about his line of work. Oboh stated he was a buyer of medical supplies for a hospital, then stated he worked for a group of hospitals, yet could not name a specific hospital. (T.158). Additionally, Oboh was unable to produce a business card. (T.160). Inspector Bartel asked Oboh to empty his pockets and place the contents on the table (T.159), and then asked Oboh to remove his jacket for a patdown search. (T.162).

Inspector Bartel proceeded to conduct the patdown examination, loosely rubbing his hands over Oboh's clothing. (T.163–164). When he reached the groin area, he felt an unnaturally hard object. (T.164). Oboh said that it was his penis, but Inspector Bartel did not believe that it was, and decided that a strip search was appropriate. (T.165). Inspector Bartel then escorted Oboh, who was reluctant, into the handicap bathroom. (T.168). At that point, Inspector Bartel suspected that Oboh had contraband hidden in his pants. (T.169).

In the bathroom, Inspector Bartel asked Oboh to remove his shirt and shoes, and he complied, but yelled at the inspectors in the process. (T.171). When Inspector Bartel asked him to remove his pants, Oboh became louder and more boisterous. (T.171). He hesitated removing them, and pulled them down partially several times. (T.172). Finally, Oboh removed his pants and, with his pants in his hands, attempted to move past Inspector Bartel toward the toilet. (T.173). Inspector Wyzykiewicz assisted Inspector Bartel in restraining Oboh, and Bartel took the pants out into the dining car. (T.174).

Inspector Bartel opened the pants on a table and discovered a blue handkerchief containing thirty condoms filled with a white powdery substance, and emitting a foul odor. (T.174–175). Oboh was redressed and escorted off the train, and the powder was field tested. (T.175–176). The entire encounter with Inspector Bartel lasted approximately fifteen minutes. (T.176).

Customs Special Agent Vincent J. Salvatore testified that, following the seizure of the heroin, he went to the lock-up area and advised Oboh of his *Miranda* rights. (T.198). Following the reading of the rights, Oboh stated that he understood, that he did not wish to speak with the agents, and requested an attorney. (T.201). He then stated, not in response to any question, that "they planted it on me." (T.201). Agent Salvatore then asked Oboh if he would consent to an x-ray. (T.202). Oboh signed a consent form and the x-ray was taken, which proved negative for foreign substances. (T.203).

## DISCUSSION

### 1. *The Motion to Suppress*

■ Oboh argues that the evidence seized and statements made should be suppressed, as the customs and immigration inspectors has no basis to refer Oboh for a secondary inspection, and no justification to conduct a patdown or strip search. The Government argues that the search conducted by the inspectors comported with all applicable constitutional standards, and the evidence and statements should not be suppressed.

■ It is beyond dispute that searches at an international border are subject to less stringent standards than those applicable to other searches which may occur after persons or things have entered the country. Border searches, "pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border...." *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977); *see also Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). "Routine searches of the persons and effects of [bor-

der] entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant...." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985). Here, Oboh travelled by train from Canada into the United States, and attempted to enter the country at an established border checkpoint. Accordingly, he is deemed to have waived any objection to a routine search of his belongings and effects. *See United States v. Nieves*, 609 F.2d 642, 645 (2d Cir.1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980). Further, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border." *Montoya de Hernandez, supra,* at 540.

█ Oboh's argument, that the inspectors lacked the requisite level of suspicion to refer him for a secondary inspection or patdown search, is without merit. "The referral of a person entering this country to a secondary inspector is part of the 'routine' border interrogation ..." *United States v. Henry*, 604 F.2d 908, 920 (5th Cir.1979). Furthermore, the secondary inspection of Oboh did not become custodial merely because he was subjected to a patdown search, (*see United States v. Charleus*, 871 F.2d 265 (2d Cir.1989) (light touching of back and lifting of shirt is "routine"); *United States v. Grotke*, 702 F.2d 49 (2d Cir.1983) (patdown and removal of shoes is routine border search); *United States v. Nieves, supra* (removal and search of shoes is part of routine border search)), or was taken to a separate car away from other passengers. *See United States v. Harrell*, 894 F.2d 120 (5th Cir.), *cert. denied*, 498 U.S. 834, 111 S.Ct. 101, 112 L.Ed.2d 72 (1990) (defendant interrogated in a room separated from the public by glass enclosures); *United States v. Bengivenga*, 845 F.2d 593 (5th Cir.) (en banc), *cert. denied*, 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988) (secondary inspection conducted in a trailer a slight distance away from the checkpoint in order to spare the detainee public embarrassment and to keep traffic moving).

The inspectors' rationale for referring Oboh to a secondary border inspection and conducting a patdown search is irrelevant, "[h]owever, when a person is subjected to a relative degree of embarrassment or indignity when asked to remove an article of clothing, the imposition of a 'reasonable suspicion' requirement is warranted." *United States v. Moody*, 649 F.2d 124, 127 (2d Cir.1981). "When a border search extends beyond the inspection of belongings and effects, 'reasonableness is determined by weighing the warranted suspicion of the border official against the offensiveness of the intrusion.'" *United States v. Sanders*, 663 F.2d 1, 3 (2d Cir.1981) (quoting *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir.1978)). During the course of the primary and secondary inspections, the inspectors' suspicions regarding Oboh were heightened. They learned that he was a citizen of Nigeria, a source country for heroin, and that he had travelled through Brussels, Belgium, a city known as a transit point for drug couriers. Oboh gave contradictory answers to the inspectors' inquiries, stating that he was travelling both on business and for pleasure, that he was in Canada for one day and intended to visit the United States for one day, gave numerous answers regarding his line of work and could not answer questions that one would expect a person in the medical supply field to be able to answer. When Inspector Bartel conducted the patdown, he felt an unnaturally hard bulge in the groin area of Oboh's pants. Based on his experience conducting numerous patdown searches over the years, Inspector Bartel knew this could not be Oboh's penis. At that point, Inspector Bartel believed that Oboh had hidden contraband in his pants, and possessed the requisite level of suspicion justifying a strip search of Oboh. *See United States v. Ogberaha*, 771 F.2d 655, 658–660 (2d Cir.1985), *cert. denied*, 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986) (strip search properly based on reasonable suspicion of criminal activity).

█ It is apparent that the border inspection of Oboh progressed from a routine customs and immigration inquiry to a more intrusive search, as the inspectors "graduate[d] their response to the demands of [the] particular situation." *United States v. Place*, 462 U.S. 696, 709, n. 10, 103 S.Ct. 2637, 2646,

77 L.Ed.2d 110 (1983); *see United States v. Asbury, supra,* at n. 4 (customs agents ordinarily progress from less intrusive to more intrusive forms of search). Additionally, Oboh does not allege that the statements he made were the product of custodial interrogation. In the context of a routine border inspection, *Miranda* warnings need not be given "unless and until the questioning of the officials becomes an interrogation that is custodial in nature in which information is sought for the purpose of using it against such person in a criminal proceeding." *United States v. Henry, supra,* at 915. In this case, no custodial interrogation had commenced and Oboh was not entitled to *Miranda* warnings. Accordingly, the motion to suppress should be DENIED.

## 2. *The Motion to Dismiss*

■ Oboh contends that Count II of the Indictment, which charges a violation of 18 U.S.C. § 545, must be dismissed because it has been unconstitutionally applied to him, is multiplicitous, and the Indictment, charging violations of both § 952 and § 545, violates Department of Justice policy.[2] In Count II, the Government has alleged that Oboh knowingly and unlawfully brought merchandise, namely a quantity of heroin, into the United States in violation of 18 U.S.C. § 545, the smuggling statute. Oboh contends that by using the general smuggling law in this context, the Government has relieved itself of the burden of establishing specific intent to import controlled substances, as in 21 U.S.C. § 952.[3] He argues that the smuggling statute "can only be construed to cover legitimate goods which, if not declared, result in loss of revenue to the United States or otherwise effect legitimate retail marketing." *See* Defendant's Memorandum of Law, filed July 7, 1994, at 4. Oboh also contends that

Counts I and III are multiplicitous in that they allege offenses in which the elements in both counts are the same.

"A single offense may not be charged in more than one count of an indictment, lest multiple punishments attach to the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment." *United States v. Sugar,* 606 F.Supp. 1134, 1144 (S.D.N.Y.1985); *see also Bell v. United States,* 349 U.S. 81, 82, 75 S.Ct. 620, 621, 99 L.Ed. 905 (1955). However, "if Congress has defined the offenses charged as distinct and separable offenses, defendants may be charged for these offenses separately." *United States v. Sugar, supra.* The test to be applied to determine whether there are two offenses or only one offense charged is "whether each provision in the count requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Sugar, supra,* at 1145.

Count I of the Indictment alleges violations of 21 U.S.C. §§ 952(a), 960(a) and 960(b)(2) in that Oboh intentionally and unlawfully imported 100 grams or more of heroin into the United States from Canada. Section 960(a) prohibits the knowing and intentional importation or exportation of a controlled substance, contrary to § 952 of that title. Section 952(a) provides that "[i]t shall be unlawful ... to import into the United States from any place outside thereof, any controlled substance in Schedule I ...." Count II of the Indictment alleges a violation of 18 U.S.C. § 545 in that Oboh unlawfully brought merchandise into the United States. Title 18 § 545 provides that it is unlawful to bring into the United States "any merchandise contrary to law ...."[4]

---

**2.** This court recently filed, on October 18, 1994, a Report and Recommendation in *United States v. Brathwaite,* 94–CR–103S, in which the same issue was addressed. In that case, it was recommended that the motion to dismiss be denied.

**3.** Under § 952, the Government must prove intent or scienter, *i.e.,* that the defendant knew the substance was in fact a controlled substance. *See United States v. Oguns,* 921 F.2d 442, 449 (2d Cir.1990). In contrast, under § 545, possession presumes knowledge of the nature of the item

being brought into the country, eliminating the need to prove intent to smuggle. *Compare Turner v. United States,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970) (with respect to cocaine, presumption of knowing importation by virtue of possession is invalid under predecessor to § 952).

**4.** Heroin should be considered "merchandise," for purposes of the smuggling statute. Title 19 U.S.C. § 1401(c) defines "merchandise" as "goods, wares, and chattels of every description

The elements of a violation of the relevant portion of § 545 are (1) the defendant fraudulently or knowingly (2) imported or brought into the United States (3) any merchandise (4) contrary to law. *See Olais–Castro v. United States,* 416 F.2d 1155, 1158 (9th Cir. 1969). The element, "contrary to law," is construed by reference to existing statutes. *See Olais–Castro, supra,* at 1158 n. 8. In the context of a smuggling violation under § 545, "contrary to law" refers to the defendant's failure to unload and declare the merchandise at United States customs. *Olais–Castro, supra.* In contrast, a violation of § 952 is complete when the contraband is brought into the United States, regardless of whether an attempt is made to pass through customs. *See United States v. Muench,* 694 F.2d 28, 32 (2d Cir.1982). The failure to declare, as here, renders the act of importation unlawful and is an additional element of § 545 not present under § 952. Similarly, "merchandise," under § 545, need not be a controlled substance, as it must under § 952. Accordingly, as each offense requires proof of a fact not required by the other, the Indictment is not multiplicitous, and the motion to dismiss Count II should be DENIED.

■ Even assuming that the two counts are multiplicitous, Oboh is not entitled to dismissal of either of the charges. Instead, the proper remedy would be, after conviction on both counts, for the court to enter judgment on one count alone. *See Ball v. United States,* 470 U.S. 856, 865, 105 S.Ct. 1668, 1673–74, 84 L.Ed.2d 740 (1985).

Oboh relies heavily on *Palmero v. United States,* 112 F.2d 922 (1st Cir.1940), to support his argument the Indictment is duplicitous. In *Palmero,* the defendants were convicted of violations of the Narcotic Drugs Import and Export Act of 1922, the predecessor to § 952, and the Tariff Act of 1930, a predecessor to § 545. The court set aside the conviction under the Tariff Act, relying on the legislative history of the Opium Act of 1909, the predecessor to the Narcotic Drugs Import and Export Act which, according to the

court, removed opium from the provisions of Tariff Act. To resolve what the court perceived as an issue of legislative intent as to whether the Opium Act and the Narcotic Act applied to the same conduct, the court applied a rule of statutory construction that a "general statute must give way in interpretation to the particular statute." *Palmero, supra,* at 925.

*Palmero* cannot be considered as controlling or persuasive authority. In *Palmero,* the court used the same act or conduct test to determine whether there was improper multiplicity. *See Palmero, supra,* at 925. The court reasoned "[i]f the word 'merchandise' in said § 593(b) of the Tariff Act of 1930 includes any narcotic drug, then a conviction under the Tariff Act would be for the identical act also punishable under the Narcotic Act." *Palmero, supra.* This approach to the multiplicity issue was not in accordance with the *Blockburger* test elaborated by the Supreme Court eight years earlier, and represents an analysis which has never been accepted by the Court. *See United States v. Dixon,* —— U.S. ——, —— n. 14, 113 S.Ct. 2849, 2863 n. 14, 125 L.Ed.2d 556 (1993) (reaffirming *Blockburger* and noting the Court's repeated rejection of a "single transaction" analysis in multiplicity cases).

Further, the decision in *Palmero* only dealt with opium which, the court concluded, was, as an "international outlaw," not subject to tariff. *See Palmero, supra,* at 924. Whatever validity the court's conclusion may have had under the system of federal control of drugs that prevailed in 1940, it is clear that it is inapplicable to the present comprehensive scheme, adopted by Congress in 1970, regulating controlled substances including heroin, the controlled substance at issue in the instant case. The legislative history of § 952 indicates that the statute was part of a comprehensive unification of existing statutes, and "is designed to replace all present law (except the smuggling law, 18 U.S.C. 545) relating specifically to the importation and

and includes merchandise the importation of which is prohibited." This definition has been applied to § 545. *See also Olais–Castro v. United States,* 416 F.2d 1155, n. 7; *Steiner v. United States,* 229 F.2d 745, 747 (9th Cir.1956). Addi-

tionally, "merchandise" is defined as "the commodities or goods that are bought and sold in business; the wares of commerce." *See* Webster's Third New International Dictionary (1986).

exportation of narcotics and marijuana and to strengthen the present controls over the importation and exportation of depressant and stimulant drugs." H.R.Rep. No. 91–1444 (Pt. 1), 91st Cong., 2nd Sess., p. 71 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4638. Moreover, it is contemplated, under § 952, that controlled substances can be lawfully imported "for medical, scientific, or other legitimate uses, and only in accordance with whatever notification or declaration requirements might be prescribed by the Attorney General." H.R.Rep. No. 91–1444 (Pt. 1), 91st Cong., 2nd Sess., p. 72 (1970), *reprinted in* 1970 U.S.C.C.A.N., *supra.* This fact further reinforces the position that the two statutes represent distinct offenses which can be separately prosecuted under *Blockburger.*

Additionally, the Second Circuit has specifically held that whether an article of merchandise is subject to duty is irrelevant to a violation of § 545. *See United States v. Borello,* 766 F.2d 46, 51 (2d Cir.1985); *United States v. McKee,* 220 F.2d 266, 269 (2d Cir. 1955). Further, the definition of "import" under 21 U.S.C. § 951(a)(1) specifically provides that "import" includes "any bringing in or introduction" of any article of controlled substances into any area of the United States "whether or not such bringing in or introduction constitutes an importation within the meaning of the tariff laws of the United States." Thus, one of the major grounds underlying the court's analysis in *Palmero*— that opium, as prohibited contraband, was no longer intended to be an article of merchandise subject to the Tariff Act—even if valid in 1940, no longer applies. As this analysis is necessarily limited to opium, any suggestion that it applies to heroin at this time is without foundation.[5]

In *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), the Court was faced with a similar multiplicity argument where the defendant was convicted of and sentenced for violations of the Internal Revenue Code of 1954 and the Narcotic Drug Import and Export Act. Specifically, Gore was accused of selling capsules of heroin and cocaine not "in pursuance of a written order," and not "in the original stamped package or from the original stamped package" in violation of §§ 4705(a) and 4704(a) of the Internal Revenue Code, and with knowledge that the drugs had been illegally imported in violation of § 2(c) of the Narcotic Import and Export Act.

Writing for the majority, Justice Frankfurter characterized the defendant's argument as urging the Court to read the statutes

> as reflecting a unitary congressional purpose to outlaw non-medicinal sales of narcotics. From this the conclusion is sought to be drawn that since Congress had only a single purpose, no matter how numerous the violations by an offender, of the specific means for dealing with this unitary purpose, the desire should be attributed to Congress to punish only as for a single offense when these multiple infractions are committed through a single sale.

*Gore v. United States, supra,* at 390, 78 S.Ct. at 1283. Rejecting this argument, and an invitation to reconsider the *Blockburger* decision, the Court found that the statutes had "different origins both in time and in design" and reflected "the determination of Congress to turn the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter." *Gore, supra.* The Court found that the defendant in *Gore* was properly convicted of all three offenses

5.  A close reading of the Congressional committee reports cited by the court does not, contrary to the conclusion drawn by the Defendant, support the statement that Congress intended to withdraw opium from the definition of merchandise under the predecessor to § 545. *See Palmero, supra,* at 925. The report of the House Ways and Means Committee on the bill stated that the smuggling act "covers all articles imported contrary to law, and would possibly cover prohibited opium, without its reenactment as section 2 of this act, but this can certainly be no valid objec-

tion to including its provision here, and applying it specifically to opium as is done in section 2." H.Rep. No. 2003, 60th Cong., 2d Sess. 1 (1909). Section 2 of the bill enacted enforcement and penalty provisions similar to those provided in the smuggling law. There is no actual language stating that, after enactment of the bill, the smuggling law would not apply to opium. *See* P.L. 221, 35 Stat. 614 (1909). Relevant portions of the reports have been appended to this Report and Recommendation.

and was properly sentenced to consecutive terms of imprisonment.

Similarly, the two statutes at issue here, sections 952 and 545, have different origins in time and design. It is "more daring than convincing to suggest" that these different statutes "ought to have carried with them an implied indication by Congress that ... the defendant should be treated as though he committed only one of these offenses." *Gore, supra,* at 390–391, 78 S.Ct. at 1283. To the contrary, "[b]oth in the unfolding of the substantive provisions of law and in the scale of punishments, Congress has manifested an attitude not of lenity but of severity toward violation of the narcotics laws." *Gore, supra,* at 391, 78 S.Ct. at 1284. The same may fairly be said as to the prosecution of Oboh's conduct in this case. As there is neither an express nor implied congressional intent to punish only one of Oboh's offenses, Count II of the Indictment should not be dismissed.

Aside from double jeopardy, Oboh has raised no articulable constitutional impediment to the charges as contained in the Indictment. Additionally, contrary to Oboh's contentions, *see* Defendant's Memorandum of Law dated July 7, 1994, at 10–12, neither the sentencing guidelines nor Department of Justice policy prevents the Government from charging Oboh with violations of both the smuggling statute and § 952. It is established that a violation of internal Justice Department policy confers no rights on a defendant. *See United States v. Ng,* 699 F.2d 63, 71 (2d Cir.1983). Furthermore, the sentencing guidelines do not support Oboh's argument that § 545 is not intended to address the smuggling of controlled substances. The introductory commentary to § 2T3.1 states that the section applies to violations involving revenue collection or trade regulation, and not to the importation of drugs or other contraband. That is not to say that § 545 does not apply in cases where the defendant is accused of the importation of controlled substances or other contraband, but rather that this particular guideline does not address such a situation. In such a case, § 2T3.1 would be inapplicable, and the sentencing court is directed to refer to a more specific guideline involving controlled substances.

## CONCLUSION

Based on the foregoing analysis, the Defendant's motions to suppress evidence and to dismiss Count II of the Indictment should be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 30(a).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.

DATED: October 21st, 1994

Buffalo, New York

APPENDIX

60TH Congress 2d Session

House of Representatives

Report No. 2003

PROHIBITING THE IMPORTATION AND USE OF OPIUM FOR OTHER THAN MEDICINAL PURPOSES

February 1, 1909

MR. PAYNE, from the Committee on Ways and Means, submitted the following

## REPORT

[To accompany H.R. 27427]

The Committee on Ways and Means, to whom was referred the bill (H.R. 27427) to prohibit the importation and use of opium for other than medicinal purposes, having had the same under consideration, report it back to the House without amendment and recommend that the bill do pass.

This bill prohibits the importation of opium into the United States from and after the 1st day of April next, with a proviso that opium for medicinal purposes may be imported, upon payment of the duty prescribed by law and under regulations to be prescribed by the Secretary of the Treasury.

Section 2 is drawn substantially after section 3082 of the Revised Statutes, and provides safeguards for rendering effective the provisions of section 1, and for the punishment of offenders, etc.

Section 3082, above referred to, covers all articles imported contrary to law, and would possibly cover prohibited opium, without its reenactment as section 2 of this act, but this can certainly be no valid objection to including its provision here, and applying it specifically to opium as is done in section 2. Section 3082 was enacted in 1799 originally, amended in 1866 and 1876, and has stood the test of judicial examination in several cases.

60TH Congress 2D Session

## HOUSE OF REPRESENTATIVES

Report No. 1878

January 19, 1909

MR. MANN, from the Committee on Interstate and Foreign Commerce, submitted the following REPORT

[to accompany H.R. 24863]

The bill as reported only affects opium imported for smoking and does not affect opium imported for medicinal purposes. Section 2 of the bill applies to opium brought into the country contrary to law, the language of section 3082 of the Revised Statutes now affecting merchandise brought into the country contrary to law. Section 1 of the bill has the approval of the manufacturing pharmacists, as smoking opium is not used for medicinal purposes.